AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.  2:19 mj 550 |
| Information associated with Facebook user ID 10000423868294, that is stored at premises controlled by Facebook Inc. | )<br>)<br>) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1962 (d) | Conspiracy to commit racketeering |
| 18 USC 1959 (a) (1) | Murder in aid of racketeering |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Thomas J. Gill
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  7-10-19

City and state:  Columbus, OH

_____
*Judge's signature*

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100004232868294, USERNAME PABLITO ELFALIJIDO FLORES, THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC.** | Case No. 2:19 mj 550 <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Thomas J. Gill, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Columbus Resident Agency for the Southern District of Ohio, Eastern Division, where I have worked for more than 21 years. I am currently assigned to the Violent Crimes Squad.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of

18 U.S.C § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3. During my tenure as a Special Agent with the FBI, I have been assigned to work on various types of investigations, including violent crimes, narcotics offenses, gang investigations, money laundering, and terrorism. I have experience in the execution of search warrants and the debriefing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience in the use of sophisticated investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps. I also have experience investigating, monitoring, and reviewing social media accounts.

4. For more than three years, I, along with other agents and officers from the FBI, Immigrations and Customs Enforcement (ICE), the Columbus Division of Police (CPD), and the Franklin County Sheriff's Office (FCSO), have been investigating the transnational criminal organization La Mara Salvatrucha, commonly known as MS-13. Over the course of this investigation, I have become familiar with the membership and structure of MS-13 and the nature and scope of criminal activities in which members and associates of the gang engage, both in the Southern District of Ohio and elsewhere.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1962(d) (conspiracy to commit

2

racketeering) and 18 U.S.C. § 1959(a)(1) (murder in aid of racketeering) have been committed by members and associates of MS-13. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

7.      Based on my training and experience, as well as information obtained from (i) interviews with sources of information and other witnesses, (ii) investigative reports, (iii) federal and state law enforcement officers from around the United States, (iv) law enforcement officers in El Salvador, (v) publications regarding the history and structure of MS-13 prepared by federal and state agencies for law enforcement purposes only, and (vi) the ongoing investigation of MS-13 in this district, I am aware of the following facts.

## La Mara Salvatrucha (MS-13)

8.      MS-13 is a multi-national criminal organization composed primarily of immigrants or descendants of immigrants from El Salvador, Guatemala, and Honduras. Though estimates vary, MS-13 is believed to have 30,000 – 60,000 members around the world. The organization's leadership is based in El Salvador, where many of the gang's high-ranking members are imprisoned.

9.      The name "Mara Salvatrucha" is a combination of several slang terms. "Mara" is the El Salvadoran word for "gang." The phrase "Salvatrucha" is a combination of two words: "Salva" is an abbreviation for "Salvadoran," and "trucha" is a slang word for "fear us," "look out," or "heads up."

10.      MS-13 originated in the United States when El Salvadoran immigrants fled to this country to escape civil war in the 1980s. When these immigrants settled in Southern California, they formed MS-13, which is loosely affiliated with the Mexican Mafia, as a way to protect

themselves from other street gangs in the Los Angeles area. MS-13 developed into a dangerous criminal organization that spread to other areas of the United States. A large-scale deportation effort resulted in many MS-13 members and associates being sent back to El Salvador, where the gang grew in size and strength. Thousands of individuals with ties to MS-13 have since entered the United States.

11. In 2012, the United States government designated MS-13 as a "transnational criminal organization." It is the first and only street gang to receive that designation. MS-13 has become one of the largest criminal organizations in the United States, with more than 10,000 members and associates operating in at least 40 states, including Ohio. MS-13's presence continues to grow in and around the country, in light of the organization's active recruitment efforts – which often target juveniles from El Salvador and other Latin American nations – and the regular flow of new, potential members from other states and foreign countries.

12. In Ohio and elsewhere in the United States, MS-13 is organized into "cliques," which are smaller groups of MS-13 members and associates acting under the larger mantle of the organization and operating in a specific region, city, or part of a city. In order to organize and coordinate the many cliques comprising thousands of members located across the United States, MS-13 leadership in El Salvador has grouped the organization into regional "programs." This structure helps the gang run its operations. Specifically, organizing the various MS-13 cliques into programs facilitates the process of transmitting orders from leadership in El Salvador to cliques in the United States and sending money from cliques in the United States to leadership in El Salvador. MS-13 cliques work both independently and collectively, and generally operate under the umbrella rules of MS-13 leadership in El Salvador. The Columbus, Ohio clique of MS-13 is part of the East Coast Program.

13.     Violence is a central tenet of MS-13. The organization's motto, "mata, viola, controla," means "kill, rape, control." MS-13 members are expected to promote and protect the organization's reputation and status by any means necessary, such as by committing acts of intimation and violence, up to and including murder. Targets of violence include rival gang members, MS-13 members and associates who do not comply with the organization's rules, individuals who show disrespect to the gang or are otherwise perceived as a threat, and those suspected of cooperating with law enforcement. Historically, MS-13 members and associates have committed murders and other violent acts using machetes, knives, and similar bladed weapons in order to intimidate and instill fear in others.

14.     MS-13 members and associates in Ohio and elsewhere engage in a wide range of criminal activity, including, but not limited to, racketeering, murder, attempted murder, drug trafficking, extortion, money laundering, assault, obstruction of justice, witness intimidation, weapons offenses, and immigration-related violations. MS-13 members are expected to commit such acts to maintain membership and discipline within the organization. Participation in violence and other criminal activity increases the level of respect accorded to a member or associate, resulting in that person maintaining or increasing his position in the organization. MS-13 also enforces its authority and promotes discipline by committing or threatening to commit violence, or otherwise punishing, members and associates who do not comply with the organization's rules.

### Operation of MS-13 in the Southern District of Ohio

15.     The United States has been aware of the presence of MS-13 in the Southern District of Ohio since the mid-2000s. Enforcement action against the gang over the past decade has met with varying degrees of success. The FBI initiated the current investigation in December 2015, following the discovery of the bodies of two males who were brutally murdered in Columbus, Ohio earlier that year. Shortly thereafter, a task force consisting of agents and officers from the FBI, ICE, CPD, and FCSO was created to focus on the Columbus clique of MS-13 and investigate the organization's criminal activities in this district.

16.     On July 27, 2017, the grand jury in the Southern District of Ohio returned the Indictment, which charged ten defendants in connection with the criminal conduct described above. On December 14, 2017, the grand jury returned the Superseding Indictment, which charged 14 defendants in connection with the criminal conduct described above.

17.     On February 15, 2018, the grand jury returned the Second Superseding Indictment, which charges 23 defendants in connection with the criminal conduct described above. Two counts in the Second Superseding Indictment are pertinent to the requested search warrant. Count One charges MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia/Pelon, JOSE BONILLA-MEJIA, a/k/a Espia, JUAN JOSE JIMENEZ-MONTUFAR, a/k/a Chele Trece, PEDRO ALFONSO OSORIO-FLORES, a/k/a Smokey, ISAIAS ALVARADO, a/k/a Cabo, CRUZ ALBERTO-ARBARGNAS, a/k/a Cruzito, JOSE MANUEL ROMERO-PARADA, a/k/a Russo, JUAN JOSE ALVARENGA-ALBERTO, a/k/a Sailen, JUAN FLORES-CASTRO, a/k/a Duende, JOSE DANIEL GONZALEZ-CAMPOS, a/k/a Flaco, JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, JOSE MENDEZ-PERAZA, a/k/a Shadow, ERASMO HUMBERTO LIMA-MARTINEZ, a/k/a Tun Tun, NEHEMIAS JOEL MARTINEZ-

HERNANDEZ, a/k/a Mysterio, JOSE CARLOS MERCADO-CRESPIN, a/k/a Payaso, DENIS DONALD FUENTES-AVILA, DANIEL ALEXANDER DIAZ-ROMERO, a/k/a Manchas, GERARDO DAVILA-COLINDRES, a/k/a Cuervo/Enano, MARVIN OTERO-SERRANO, a/k/a Vaca, JORGE ALBERTO LANDAVERDE, a/k/a Grenas, JOSE SALINAS-ENRIQUEZ, a/k/a Martillo, NELSON ALEXANDER FLORES, a/k/a Mula, CAROLINA GARCIA-MIRANDA, a/k/a Mamayema, with conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d). The time period of the conspiracy is 2006 through the date of the Second Superseding Indictment (*i.e.*, February 15, 2018). Count One identifies 59 criminal acts, including five homicides, that the defendants and others committed to further the conspiracy and achieve the goals of MS-13. Among those acts is the murder of Wilson Villeda, a 17 year-old high school student who was killed with machetes and/or other bladed weapons in Columbus, Ohio in 2015. Count Three charges 12 defendants with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 2. The victim is identified as Wilson Villeda.

18. Villeda was reported missing on November 15, 2015. On December 3, 2015, law enforcement officers discovered his mutilated body in a shallow grave in a wooded area near 3000 Innis Road, Columbus, Ohio. The victim's body was unearthed a short distance from the residence of JIMENEZ-MONTUFAR (a/k/a Chele Trece). JIMENEZ-MONTUFAR resided at 3350 Anita Street, Columbus, Ohio, a common gathering place for MS-13 members and associates in central Ohio.

19. Forensic examiners concluded that the cause of Villeda's death was chop injuries to his head, torso, and extremities. They further determined that the object(s) used to cause these injuries was a bladed weapon of medium weight, such as a machete or a meat cleaver. Based on evidence obtained during the course of this investigation, investigators believe that Villeda likely

was killed on November 14 or November 15, 2015.  The evidence also suggests that OSORIO-FLORES and other MS-13 members and associates planned Villeda's homicide for some time.

20.    OSORIO-FLORES is one of 12 defendants charged with murdering Villeda.  In 2016, the Columbus Division of Police obtained a search warrant for information associated with Facebook username Fernando Cariyo, user ID 100010278398124, an account that OSORIO-FLORES used from at least October 2015 through February 2016.

21.    According to the records that Facebook provided in response to the search warrant, OSORIO-FLORES was in frequent contact with Facebook username Pablito Elfalijido Flores, user ID 100004232868294 ("Flores").

22.    For example, on October 27, 2015, Flores used Facebook to send a photograph of an Hispanic male to OSORIO-FLORES, which led to the following exchange:

> **Osorio-Flores:**  "And that rival gang member, where is he?"
>
> **Flores:**  "He supposedly lives here in Columbus."
>
> **Flores:**  "Espia sent them to me."[1]
>
> **Osorio-Flores:**  "Cool, dog."
>
> **Flores:**  "There it is so you can look for it."[2]

23.    Later in the conversation, Flores sent another photograph of what appeared to be the same Hispanic male to OSORIO-FLORES.  This exchange ensued:

> **Osorio-Flores:**  "Yes, dog.  It's easy.  Tia is friends with that coward."
>
> **Osorio-Flores:**  "You will know."

---

[1] "Espia" is the nickname of Jose Bonilla-Mejia, a defendant in this case.

[2] The Facebook messages quoted in this affidavit are in Spanish.  An FBI linguist translated the messages from Spanish to English.  Punctuation and capitalization have been added for clarity.

**Flores:** "Yes, we are already working on it."

**Flores:** "Ha ha. I've put her on the job."

24. Based on my training and experience, as well as my extensive involvement with this investigation, I believe that OSORIO-FLORES was communicating with a co-conspirator, Flores, about the identity of a rival gang member and MS-13's intention to hunt down this individual. MS-13 regularly targets rival gang members (and others who are perceived to be threats to the criminal organization) for acts of violence. Investigators have learned that BONILLA-MEJIA (a/k/a Espia), the person whom Flores claimed sent him the photograph that he shared with OSORIO-FLORES on October 27, 2015, used Facebook to search for, identify, and target rival gang members.

25. In the weeks leading up to Villeda's death, OSORIO-FLORES and Flores communicated about the victim. On October 26, 2015, Flores used Facebook to send a photograph of Villeda and a photograph of a second Hispanic male to OSORIO-FLORES. They then exchanged the following messages:

**Flores:** "What do you have to say about that, dog?"

**Osorio-Flores:** "Yep, you are right, at once."

**Osorio-Flores:** "That's right, dog."

**Osorio-Flores:** "You've already said it, that dude is going down."

**Osorio-Flores:** "And he surely has a gun, dog."

**Flores:** "Alright, dog."

**Osorio-Flores:** "We'll bring Chele to jump him."[3]

**Flores:** "A gun, you know what it is, right?"

---

[3] "Chele Trece" is the nickname of Juan Jose Jimenez-Montufar, a defendant in this case.

**Osorio-Flores:** "They are two brothers. The damn younger one is my cousin from my dad's side. He has already screwed up. You already know."

**Flores:** "Right."

**Osorio-Flores:** "We can jump him whenever you want."

**Osorio-Flores:** "I know where he lives."

**Flores:** "Alright, we'll have to do it at my aunt's house. He was there yesterday and she was the one who told me that he was there, but she only saw him when he was getting there. She says that if she had seen him earlier, she would have called me so we could go and do that. You already know how I have my aunt, dog."

**Osorio-Flores:** "Cool, dog. I like it, you know?"

**Flores:** "Yeah, I'm going to do all of that, dog."

**Osorio-Flores:** "I know where he lives. Whenever you want. He gets me weed sometimes."

**Flores:** "Okay. Got it. I'll keep that in mind. Okay, dog?"

**Osorio-Flores:** "Alright. Be careful, dog."

**Flores:** "You too, dog. We are on our way there."

26.     Based on my training and experience, as well as my extensive involvement with this investigation, I believe that OSORIO-FLORES was communicating with a co-conspirator, Flores, about MS-13's plan to murder Villeda. When OSORIO-FLORES stated that they would "bring Chele to jump" the victim, he likely was referring to JIMENEZ-MONTUFAR (a/k/a Chele Trece), one of the more violent MS-13 members in Columbus, Ohio. In the Second Superseding Indictment, JIMENEZ-MONTUFAR is one of 12 defendants charged with murdering Villeda.

27.     On November 14, 2015 – within one day of the Villeda homicide – OSORIO-FLORES and Flores had the following exchange on Facebook:

**Osorio-Flores:** "What's up, dog? Are you still at Chele's?"

**Flores:** "No, dog. I am working. Why, dog?"

**Flores:** "Why, dog?"

**Osorio-Flores:** "When you are free, stop by his place. We are going to start the plan."

**Flores:** "Okay, cool."

28.     Based on my training and experience, as well as my extensive involvement with this investigation, I believe that OSORIO-FLORES was communicating with a co-conspirator, Flores, about the plan to murder Villeda later that day (or early the following day). When OSORIO-FLORES asked Flores if he was "still at Chele's," he likely was referring to JIMENEZ-MONTUFAR's (a/k/a Chele Trece) residence at 3350 Anita Street, which is a short distance from where Villeda's body was found. It is also worth noting that the individual with whom OSORIO-FLORES was exchanging messages had the Facebook username Pablito Elfalijido Flores, which is very similar to the name of a co-defendant in this case, JUAN FLORES-CASTRO (a/k/a Duende). In the past, FLORES-CASTRO has used the name Juan Pablo Guerra-Flores. FLORES-CASTRO is alleged to be a member of MS-13 and is one of 12 defendants charged with murdering Villeda. Thus, the information sought in Attachment B is likely to include evidence relevant to the Villeda homicide, including, but not limited to, the true identity of Facebook username Pablito Elfalijido Flores, user ID 100004232868294, and details about his activities before, during, and immediately after Villeda was murdered.

29.     On or about May 26, 2019, the FBI sent a preservation request for Facebook username Pablito Elfalijido Flores, user ID 100004232868294. That letter requested the preservation of records from the inception of the account to the present.

30.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

31.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

32.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

33.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

34.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

35.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

36.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a

chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

37.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

38.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

39.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

40.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

41.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

42.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

44.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and

15

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

46.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

48.     Based on the forgoing, I request that the Court issue the proposed search warrant.

Because the warrant will be served on Facebook, who will then compile the requested records at

a time convenient to it, reasonable cause exists to permit the execution of the requested warrant

at any time in the day or night.

49.     This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction

over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.

## REQUEST FOR SEALING

51.     I further request that the Court order that all papers in support of this application,

including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of

the targets of the investigation.  Accordingly, there is good cause to seal these documents

because their premature disclosure may seriously jeopardize that investigation.


Respectfully submitted,


Thomas J. Gill
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on July ___10___, 2019.


HONORABLE CHELSEY M. VASCURA
United States Magistrate Judge
Southern District of Ohio

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100004232868294, username Pablito Elfalijido Flores, that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.     Information to be Disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from account inception to the present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from account inception to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user from account inception to the present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account from account inception to the present;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

2

(o)     The length of service (including start date) and the means and source of any
        payments associated with the service (including any credit card or bank account
        number);

(p)     All privacy settings and other account settings, including privacy settings for
        individual Facebook posts and activities, and all records showing which Facebook
        users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person
        regarding the user or the user's Facebook account, including contacts with support
        services and records of actions taken.

**Facebook is hereby ordered to disclose the above information to the government**

**within 14 days of service of this warrant.**

3

**II.    Information to be Seized by the Government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1962(d) (conspiracy to commit racketeering) and 18 U.S.C. § 1959(a)(1) (murder in aid of racketeering) involving any of the defendants named in the Second Superseding Indictment from 2006 to the present, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications with any member(s) or associate(s) of MS-13 that relate to the racketeering conspiracy charged in Count One of the Second Superseding Indictment;

(b) Communications that pertain to the murder of Wilson Villeda as charged in Count Three of the Second Superseding Indictment, including steps taken in preparation for the homicide and actions taken during and after the homicide;

(c) Records indicating the whereabouts of Facebook user ID 100004232868294, username Pablito Elfalijido Flores, on November 14 and November 15, 2015;

(d) Records identifying individuals involved in the racketeering conspiracy charged in Count One and/or individuals involved in the murder of Wilson Villeda charged in Count Three;

(e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(f) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

4

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.